## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **SOUTHWEST AIRLINES CO.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| | § | **CIVIL ACTION NO. _____** |
| **FRED BISHOP; DAN BURGESS; CRAIG** | § | |
| **HAMLET; WAYNE LAMPLEY; LUCAS** | § | **ORIGINAL COMPLAINT** |
| **MIDDLEBROOK; BRET OESTREICH;** | § | |
| **AND AIRCRAFT MECHANICS** | § | |
| **FRATERNAL ASSOCIATION,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |
| | § | |
| | § | |

## PLAINTIFF SOUTHWEST AIRLINES CO.'S ORIGINAL COMPLAINT

1. Southwest Airlines Co. ("Southwest" or the "Company") hereby files its Original Complaint for violations of the Railway Labor Act ("RLA" or the "Act"), 45 U.S.C. § 151 *et seq.* to stop and seek relief relating to Defendants intentional and unlawful effort to promote an illegal job action among Southwest's mechanics. Specifically, Defendants have engaged in a system-wide campaign to encourage mechanics to utilize targeted non-operative write-ups having no effect on the safety of flight for the sole purpose of improving Defendant Aircraft Mechanics Fraternal Association's ("AMFA") position in ongoing labor negotiations.

2. Drawing from the playbook of other unions, AMFA has attempted to shield its unlawful activity behind an empirically impossible claim that the disruption of Southwest's operations merely reflects an increased focus by Southwest's mechanics on "safety." In fact, AMFA itself continues to use the code language of "safety," "compliance," and "by the book" to hide the nature of its true behavior. However, these attempts at misdirection have no basis in

fact—just like they had no basis when courts enjoined the Atlas Air pilots' union in 2017, the United Air Lines mechanics' union in 2001, and the Texas International Airlines pilots' union in 1981 for the exact same conduct under the same so-called "safety campaign" strategy.

3.      But AMFA is not just copying other unions.  It is also attempting to reboot its failed job action strategy from two years ago.  In February 2017—almost two years to the day before the current job action—AMFA launched a widespread overtime job action that prompted Southwest to seek judicial intervention.  *See Southwest Airlines Co. v. Aircraft Mechanics Fraternal Assoc., et al.*, No. 3:17-CV-00431-M, Dkt. No. 1 (February 15, 2017) (hereinafter, "2017 Job Action Litigation").  The anniversary-style timing of the two job actions is no coincidence: AMFA has repeatedly made slogans like "No Contract No LUV[1]" a central rallying cry and used February 14—St. Valentine's Day—as a focal point for triggering illegal activity.

4.      AMFA's job action misconduct represents just one piece of its larger effort to leverage unlawful RLA activity to improve its bargaining position as spearheaded by bargaining committee member Lucas Middlebrook ("Middlebrook").  Under the leadership of Middlebrook, AMFA intentionally and falsely induced Southwest and Judge Godbey to stay the 2017 Job Action Litigation in April 2018.  Specifically, just weeks before trial in the 2017 Job Action Litigation, AMFA agreed to a tentative agreement ("TA") in contract negotiations and immediately asked that Southwest stay the case rather than proceed to trial.  AMFA and Southwest (then believing AMFA) approached the Court and told it that the TA appeared very likely to resolve the litigation by implementing a new collective bargaining agreement.  But the TA had no chance to resolve the litigation.  Instead, AMFA effectively utilized the TA to avoid the significant risk they would be found to have engaged in prior job activity at trial and then immediately pivoted to defeating the

---

[1] "LUV" is the ticker symbol for Southwest's stock.

TA.  AMFA's bad faith effort to undermine the bargaining negotiations, waste the parties' time and resources, and thwart resolution of an ongoing lawsuit constitutes a violation of Defendants' duty to exert every reasonable effort to make and maintain agreements, without any interruption to commerce, under Section 2, First of the RLA.

5.     Ultimately, this case derives from AMFA's mistaken belief that its illegal TA strategy would pressure Southwest to quickly offer a richer contract.  No such offer followed the defeat of the industry-leading TA.  Now, as AMFA's members have grown unhappy with AMFA's continued failure to reach a deal, AMFA has coordinated and encouraged this second job action to try to impose additional pressure on Southwest and deflect attention from the fact that its members are suffering because of AMFA's bad conduct.  Southwest has presented AMFA with powerful statistical evidence of this illegal job action and demanded that AMFA comply with its obligations under the RLA to do everything in its power to put an end to the illegal conduct.  Yet, even after being confronted with evidence of its members' misconduct, AMFA has issued little more than denials and half-hearted statements that mechanics should not engage in unlawful activity while lacing every communication regarding the job action with its coded language of "safety" and "compliance" that has spurred—and, indeed, as of this filing continue to spur—a further spread of this unlawful activity.  Defendants' repeated illegal conduct violates federal law and requires expedited discovery to facilitate prompt consideration of a preliminary injunction.

## I.     <u>JURISDICTION AND VENUE</u>

6.     The Court has jurisdiction over this action under 28 U.S.C. § 1331 because it arises under the laws of the United States, specifically the RLA, 45 U.S.C. § 151 *et seq*.  The Court also

has jurisdiction under 28 U.S.C. § 1337 because this action arises under a statute that regulates commerce or protects trade and commerce against restraints.

7.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims set forth herein occurred in this judicial district and because Defendants engage in collective bargaining and the representation of Southwest employees in this judicial district.

## II.    <u>PARTIES</u>

8.      Southwest is a corporation organized and existing under the laws of the State of Texas and having offices and its principal place of business at 2702 Love Field Drive, Dallas, TX 75235.  Southwest is a "common carrier" by air engaged in interstate or foreign commerce under 45 U.S.C. § 181 and is subject to the provisions of the RLA.

9.      Defendant AMFA is a labor organization with its principal offices located at 14001 East Iliff Avenue, Suite 217, Aurora, Colorado 80014.   AMFA is the exclusive collective bargaining representative under the RLA for the nationwide craft or class of Mechanics and Related Employees employed by Southwest.

10.     AMFA represents the approximately 2,400 Southwest Mechanics and Related Employees on a system wide basis.  Southwest's largest aircraft maintenance facility is located in Dallas, Texas, and Southwest employs more mechanics in Dallas than in any other location.

11.     The negotiations for a nationwide collective bargaining agreement between Southwest and AMFA have been ongoing for 6.5 years.

12.     AMFA maintains a decentralized governance structure.  For Southwest, AMFA has four current Airline Representatives ("ALRs"): Dan Burgess, AMFA Local 4 ALR; Craig Hamlet, AMFA Local 11 ALR; Wayne Lampley, AMFA Local 18 ALR; and Fred Bishop, AMFA Local 32 Interim ALR.

13.     The four ALRs are the voting members of AMFA's bargaining committee responsible for negotiating a successor Southwest-AMFA collective bargaining agreement and are AMFA agents and Southwest employees.   Defendant Bret Oestreich, National Director, is a nonvoting member of the bargaining committee.

14.     Bret Oestreich, AMFA's National Director, is an officer of AMFA who acts or acted in his identified position during the relevant period pursuant to the AMFA Constitution. Oestreich maintains an office in AMFA's principal office in Aurora, Colorado.   Oestreich is a Southwest employee.

15.     Lucas Middlebrook serves as AMFA's spokesperson and is a member of AMFA's bargaining committee.   Middlebrook maintains an office at 199 Main Street, 7th Floor, White Plains, New York 10601.

16.     AMFA also has chartered Local Unions, including Locals 4, 11, 18, and 32, as agents of AMFA to represent Southwest employees in locations throughout the United States as part of the nationwide bargaining unit.

17.     Burgess maintains an office at AMFA, Local 4's offices at 9624 S. Cicero Avenue, No. 356, Oak Lawn, Illinois 60453.   Hamlet maintains an office at AMFA, Local 11's Dallas, Texas office.  Lampley maintains an office at AMFA, Local 18's office at 9001 Airport Boulevard, Suite 512, Houston, Texas 77061.   Bishop maintains an office at AMFA, Local 32's office at 3414 S. 48th Street, Suite 109, Phoenix, Arizona 85040.

## III.     FACTUAL BACKGROUND

### A.     SOUTHWEST'S AIRLINE OPERATIONS

18.     Southwest is a scheduled air carrier engaged in interstate and foreign transportation of passengers and freight.

19.     Southwest is one of the largest scheduled passenger airlines in the world and the largest carrier in the United States in terms of originating domestic passengers boarded.  Southwest serves a network of 99 destinations across the United States and 10 additional countries with approximately 4,000 weekday departures a day during peak travel season.  Southwest employs more than 58,000 individuals, and serves over 120 million customers annually.  Southwest is an integral part of the country's air transportation system, connecting and interchanging freight and passengers with many other carriers, both inside and outside the airline industry.

20.     Southwest maintains substantial facilities and has an investment in operating equipment and property related to this Complaint and expends over $1 billion annually on aircraft maintenance.

### B.     THE SOUTHWEST – AMFA COLLECTIVE BARGAINING AGREEMENT

21.     Southwest and AMFA are parties to a system wide collective bargaining agreement that sets the rates of pay, rules, and working conditions for the craft or class of Mechanics and Related Employees employed by Southwest nationwide.  The most recent collective bargaining agreement ("CBA" or the "Agreement") between Southwest and AMFA was effective as of August 16, 2008 and became amendable on August 16, 2012.

22.     Pursuant to Section 6 and Section 2, First of the RLA, the rates of pay, rules, and working conditions under the CBA continue in effect while the parties negotiate for a successor agreement.  45 U.S.C. §§ 156, 152 First.  Accordingly, Southwest and AMFA remain subject to a statutory *status quo* obligation under the RLA.  Under Section 2, First, the RLA imposes an affirmative legal duty on the union to make every reasonable effort to prevent or end strikes or other concerted work actions, such as refusals to work.

23.     The RLA also sets forth a detailed sequence of steps that are required to occur during the renegotiation of a collective bargaining agreement.  In progression, those steps include negotiations between the parties, mandatory mediation before the National Mediation Board ("NMB"), possibly followed by binding interest arbitration or a Presidential Emergency Board. All such efforts to reach an agreement must be exhausted, including a 30-day "cooling-off" period following a release from mediation or any Presidential Emergency Board proceedings, before the parties are permitted to engage in self-help, such as strikes or other concerted refusals to work or disrupt the operations.

24.     Southwest and AMFA have been in collective bargaining negotiations for modifications to the Agreement since shortly after the Agreement became amendable in August 2012.

25.     In 2015, having not yet successfully reached agreement on a successor collective bargaining agreement, the parties began a formal mediation process under the supervision of the NMB.

26.     Following an unsuccessful mediation session in 2017, AMFA supported an overtime boycott by its members.  Southwest's operations were greatly impacted by AMFA's illegal conduct in February 2017, and the 2017 Job Action Litigation is currently pending.

C.      **DEFENDANTS' BAD FAITH FAILURE TO MAINTAIN THE PARTIES' TENTATIVE AGREEMENT**

27.     On April 10, 2018, representatives of Southwest and AMFA's respective bargaining committees reached an Agreement in Principle ("AIP") on the terms for a new contract between Southwest and its employees in the craft or class of Mechanics and Related Employees.

28.     Under established negotiating practice between the parties, the AIP was the first step in a series of actions that, if completed successfully, would have resulted in a new collective

bargaining agreement between Southwest and AMFA, and would have resolved the parties' ongoing dispute under Section 6 of the RLA and the 2017 Job Action Litigation.  Through that process, the parties reduced to full collective bargaining agreement language the terms of the AIP in the form of a TA.  The TA itself was, for all intents and purposes, a final agreement between AMFA and Southwest, which required only ratification by AMFA's membership before becoming a binding collective bargaining agreement.  Once the AIP language was finalized into a TA, the parties then submitted the TA for consideration by AMFA's membership, and the membership was given an opportunity to vote on whether to ratify the tentative agreement.  If a majority of AMFA's membership voted to ratify the tentative agreement, then the TA would become a new collective bargaining agreement that would govern the parties' relationship moving forward.

29.     AMFA explained this process to its membership in a May 5, 2018 announcement: "The Company assembled all of our previously tentatively agreed sections into one full document in the days following the achievement of the AIP. . . .  Once we have a final cover-to-cover TA, the document will be sent to you from Southwest via your [company-provided email address].  The Committee will give you a week to review the TA and will then commence the roadshow.  The TA ratification referendum will start after the conclusion of the roadshow."  Under this process, the terms in the AIP and subsequent TA were conditioned on ratification.

30.     Immediately after entering into the AIP, Southwest and Defendants jointly moved the Court for an order staying the 2017 Job Action Litigation pending the outcome of the ratification process.

31.     In their Joint Motion to Stay Litigation Pending Ratification of Collective Bargaining Agreement, the parties jointly represented to the Court that "staying this case will assist the parties both in finalizing their contractual agreement and in resolving this case without the need

for trial."  Notably, Defendants gave **NO** indication—to Southwest or to the Court—that they intended to **actively** oppose the TA, to encourage AMFA members to reject ratification, and to frustrate the parties' efforts to resolve their underlying dispute over formation of a new collective bargaining agreement under Section 6 of the RLA.

32.     Similarly, in communications to its membership shortly after the parties reached their TA but before the pending litigation was stayed, AMFA did not indicate that it intended to undermine or campaign against the TA.  In a statement that AMFA issued on April 11, 2018, which was published on AMFA's publicly available website, AMFA stated that its bargaining committee had "decided that it will not endorse this AIP or recommend that you vote yes." Withholding an endorsement or recommendation to vote yes is categorically different than affirmatively campaigning against the TA and recommending that it be rejected in the ratification process.

33.     Based on AMFA's agreement and representations to Southwest around the time the parties reached the AIP, Southwest devoted substantial effort and resources over the next two months to convert the AIP into a detailed TA embodied in collective bargaining agreement language to codify the parties' agreement on a myriad of topics.  Southwest would not have undertaken this effort, in conjunction with AMFA representatives, had AMFA told Southwest there was, in fact, no agreement between the parties as of April 2018 or that AMFA intended to actively oppose ratification of the TA.

34.     On June 27, 2018, the parties announced that they had finalized the language in the AIP and had entered into the TA.  Thereafter, AMFA announced that a voting period would take place from August 23, 2018, through September 18, 2018, during which time AMFA's members would be able to vote either to ratify or reject the TA that the parties had negotiated in good faith.

35.     Almost immediately after a stay was entered in the 2017 Job Action Litigation, AMFA shifted its tone regarding the TA, and actively campaigned against the TA.  As a result of AMFA's actions, AMFA's members voted against ratification of the TA.

36.     In fact, though AMFA at first publicly indicated that it would, at the very least, remain neutral with respect to the TA, AMFA quickly abandoned any such pretense.

37.     Throughout the summer, Defendants publicly disparaged the TA.  Defendants' conduct was plainly intended to undermine the TA and ensure that it failed ratification.

38.     AMFA and the individual Defendants took several affirmative steps to undermine the parties' TA, including but not limited to the following:

   a)     AMFA, its leadership, and its counsel conducted "Road Shows," during which they travelled to different maintenance facilities across the country, disparaging the terms of the TA and publicly encouraging AMFA members to reject the agreement.

   b)     AMFA issued several publications, flyers, and internet posts critical of the TA, including communications that identified the agreement's proposed wage increases and retroactive pay as "substandard."

   c)     In other communications, AMFA sought to mischaracterize the TA as "Southwest's Offer," instead of a mutually agreed-upon TA.  In actual fact, the parties' TA was just that—an agreement subject to a condition of membership ratification.  AMFA's representations that the TA was merely an "offer" was patently incorrect and had the effect of misleading AMFA's membership during the ratification period.

d)      AMFA distributed paraphernalia, including coffee mugs and bracelets, emblazoned with the phrase "Vote No."

39.      In or around this same time period, AMFA Local 11 Secretary, Frank Suentzenich, posted images on Facebook encouraging AMFA members to "VOTE NO!" and stating: "The TA is out and your AMFA Negotiating Committee does not recommend it.  I support those who have my best interest at heart and will be a NO VOTE!"

40.      AMFA Local 4 Safety and Standards Chairman Pat Amore posted on Facebook encouraging AMFA members to vote "No."

41.      On August 24, 2018—one day after the start of the voting period—AMFA issued a statement to its membership urging them to vote "No" on the question of whether to ratify the parties' tentative agreement.  In that statement, AMFA told its membership that "we cannot accept this mediocre TA."

42.      On August 27, 2018, Terry Arnold, the President of AMFA's Local 4, emailed the members of Local 4 and urged them to vote "No."

43.      On September 2, 2018, interim voting results of electronic balloting were leaked to AMFA's membership.  The leaked raw data, which indicated that the ratification vote was on track to fail, likely had the effect of discouraging any AMFA members who may have supported ratification.  Only AMFA officers and staff had access to the electronic voting system for purposes of assessing the interim results during the ratification process.

44.      On September 18, 2018, AMFA announced the results of the ratification vote in a press release with the heading: "AMFA AMTS OVERWHELMINGLY REJECT TENTATIVE

AGREEMENT WITH SOUTHWEST AIRLINES."[2]  However, despite repeated requests, AMFA failed to release the vote tally.

45.     Within its September 18, 2018 press release, AMFA stated that, according to the Union's leadership, ratification of the TA failed "because the economic package overall falls short."

**D.     THE FEBRUARY 2019 UNLAWFUL JOB ACTION**

1.     Negotiation Sessions Leading Up to The February 2019 Job Action

46.     Following the failed ratification vote, AMFA and Southwest returned to mediation. A couple weeks before the most recent negotiation sessions, AMFA changed its graphic on social media to "I stand with AMFA, I stand with Safety."  The same image (below) appeared on the breakroom table at Southwest's Midway station on January 31, 2019.  AMFA's mantra of "safety" has become one of its rallying cries during the current job action.



47.     On February 7, 2019 and February 8, 2019, AMFA and Southwest met for the most recent mediation session.  Southwest began the meditation session with a presentation by Justin Jones, Vice President of Technical Operations, that explained why Southwest was requesting the ability to move work that Southwest already outsources from domestic contractors to international contractors, providing a cost savings that could fund an improved offer to AMFA.  During the

---

[2] "AMT" is a common abbreviation for Aviation Maintenance Technician, a formal job title for qualified aircraft mechanics.

presentation, Middlebrook repeatedly yelled at Jones that Southwest was wasting everyone's time even though AMFA had requested the presentation.  The following day, the NMB mediator was working through mediator supposals when Middlebrook began abusively yelling at her as well to the point that she had instruct Middlebrook to stop.

48.     AMFA then stormed out of the mediation session on February 8, 2019.

49.     On February 11, 2019, AMFA released a statement titled "Delay and Distort: The Truth About What Really Happened During Our Negotiations with Southwest" that discussed the February 7-8, 2019 NMB negotiations.  In the statement, AMFA claimed Southwest did not negotiate in good-faith during the February 2019 negotiation sessions.  AMFA also attacked Southwest's outsourcing presentation, and denied that it had been combative or disrespectful during the presentation.  Instead, AMFA blamed Southwest's failure to provide another offer as the sole reason the negotiations were not productive.

50.     Under the RLA, the NMB controls the pace of mediating a dispute over contract negotiations.   The next mediation session is scheduled for March 12-14, 2019.

51.     At this time, the NMB has not released the parties from mediation.  As a result, neither party is lawfully permitted to engage in strikes, lockouts, or other economic self-help such as concerted disruption to carrier operations.  At this juncture, any such self-help violates the RLA.

2.      Commencement of the February 2019 Job Action

52.     Southwest's operations rely on an adequate number of its aircraft being in service to ensure its customers reach their destinations on time as scheduled.

53.     A maintenance write up is recorded by a mechanic when in the course of job duties he/she encounters a defect or condition that requires additional inspection or a repair under Southwest's maintenance standards.  While write ups may reflect a serious issue that affects safety and airworthiness that must be immediately repaired, other write ups may be for a trivial or

cosmetic defect, such as tape on cargo bins or broken arm rests, and can be repaired at a later date. If an aircraft receives a sufficient number of maintenance write ups, the time required to repair the defects can result in the plane being removed from service.

54.     On February 12, 2019—immediately following AMFA's blow up at the NMB mediation session—Southwest began to experience an unprecedented number of aircraft out of service, despite no change in leadership and no change in policies or procedures.  Given the timing of the recent NMB negotiations and the nature of the write ups, it appeared that AMFA and its members were organizing and encouraging Southwest mechanics to unnecessarily write up maintenance issues in order to remove aircraft from service and disrupt Southwest's operations in an effort to gain an advantage in contract negotiations.

55.     Southwest began experiencing an uptick on cosmetic and other minor maintenance write ups that do not have an effect on the safety of flight.  For instance, the number of write ups for minor interior systems—i.e., a missing row number on an airline that does not assign seats— spiked almost 400% to 500% after February 10, 2019.

56.     It quickly became clear as these unusual write ups spread across Southwest's stations that something coordinated was beginning to occur—a fact borne out by the empirical data regarding Southwest's maintenance activities before and during this period.

### 3.     Statistical Evidence of the Job Action

57.     The abnormal increase in write ups dramatically impacted Southwest's operations. The concerted activity first appeared in Houston (HOU), Las Vegas (LAS), Orlando (MCO), and Phoenix (PHX) on or about February 11, 2019.  In those stations, the Unscheduled Aircraft

Downtime ("UAD") substantially exceeded the stations' average UAD.  The stations' UAD from February 11, 2019 through February 17, 2019 is summarized below.[3]

| Station | Avg. UAD | UAD 2/11/19 | UAD 2/12/19 | UAD 2/13/19 | UAD 2/14/19 | UAD 2/15/19 | UAD 2/16/19 | UAD 2/17/19 |
|---------|----------|-------------|-------------|-------------|-------------|-------------|-------------|-------------|
| HOU | **18.6** | 25 | **111** | **127** | 51 | 38 | **116** | 47 |
| LAS | **10.8** | 12 | **66** | **40** | 21 | **91** | **51** | 32 |
| MCO | **10.2** | **54** | **63** | **59** | **89** | 31 | 44 | 41 |
| PHX | **21.5** | 59 | **86** | **109** | 61 | 47 | 45 | **77** |

58.    On an average day, Southwest will have approximately 14 aircraft out of service. However, since February 10, 2019, the number of aircraft out of service has dramatically exceeded the average, which has directly impacted customer service through flight delays and cancellations. Southwest has approximately 752 active aircraft and requires approximately 717 aircraft to meet its customer obligations.   Anytime Southwest has more than 35 aircraft out of service, it is impossible for Southwest to meet its customer service obligations.  The aircraft out of service from February 11-22, 2019 is summarized below.

| Date | Number of aircraft out of service due to maintenance |
|------|------------------------------------------------------|
| Monday, February 11, 2019 | 30 |
| Tuesday, February 12, 2019 | 35 |
| Wednesday, February 13, 2019 | 47 |
| Thursday, February 14, 2019 | 46 |
| Friday, February 15, 2019 | 49 |

[3] Numbers that are bolded and underlined indicate UAD that exceeded the station's average UAD by three standard deviations.

| | |
|---|---|
| Saturday, February 16, 2019 | 39 |
| Sunday, February 17, 2019 | 36 |
| Monday, February 18, 2019 | 41 |
| Tuesday, February 19, 2019 | 62 |
| Wednesday, February 20, 2019 | 57 |
| Thursday, February 21, 2019 | 61 |
| Friday, February 22, 2019 | 53 |

59.    The number of out of service aircraft Southwest has experienced since February 10, 2019 far exceeds any prior mechanical issues or weather events that resulted in an increased number of out of service aircraft.  As the chart below indicates, based on data going back three years, the current number of out of service aircraft cannot be explained by any normal event.[4]



---

[4] AC = aircraft; OTS = out of service.

60.     In fact, as the above chart illustrates, the February 12-21 activity nearly *doubled* the system-wide emergency maintenance review of fan blades across hundreds of Southwest aircraft in April 2018.  It also exceeds the figures observed following two record-setting hail events at Denver International Airport during which dozens of aircraft required immediate inspection all at one time following localized severe weather.

61.     Further, since the inception of the job action, Southwest has experienced continued unprecedented numbers of out-of-service aircraft at elevated levels with no signs of abating as shown in the graph below:



62.     As a result of the severe disruption to Southwest's operations caused by the write up campaign, on February 15, 2019, Southwest declared an operational emergency for Phoenix, Las Vegas, Houston, and Orlando stations in an attempt to recover from the increased number of aircraft out of service and to stabilize its operations.  The operational emergency essentially called for all hands on deck to address the increased workload created by the spike in maintenance write

ups.  During the operational emergency, mechanics were required to provide a doctor's note if they called out sick, and only existing vacation requests were permitted.

63.     In response to the state of emergency, AMFA sent a memorandum to its members on February 15, 2019.  AMFA's memorandum criticized the state of emergency, characterizing it as additional "coercion" by Southwest in an attempt to "further degrade safety."  AMFA then quoted a fourteen-month old comment by Southwest's Vice President of Maintenance Operations, emphasizing only part of the quote: "*compliance, compliance, compliance is going to be our theme song for 2018.*"  Instead of discouraging any concerted activity that caused the operational emergency, AMFA implicitly encouraged its members to continue their increased write ups under the guise of "compliance" and "safety."

64.     Perhaps unsurprisingly given AMFA's February 15, 2019 memorandum, the increase in write ups did not decrease after the February 15, 2019 state of emergency declaration.  Instead, the abnormal increase in maintenance write ups spread to Dallas and other stations.  As a result, Southwest maintained the operational emergency at the prior stations and extended it to Dallas on February 19, 2019, and to Los Angeles on February 27, 2019.  The UAD from stations with abnormal activity from February 18-22, 2019 is summarized below:

| Station | Avg. UAD | UAD 2/18/19 | UAD 2/19/19 | UAD 2/20/19 | UAD 2/21/19 | UAD 2/22/19 |
|---------|----------|-------------|-------------|-------------|-------------|-------------|
| BWI | **16.1** | 27 | 20 | 38 | <u>**66**</u> | 36 |
| DAL | **30.2** | <u>**147**</u> | <u>**119**</u> | <u>**134**</u> | <u>**104**</u> | <u>**102**</u> |
| HOU | **19.0** | 50 | 65 | <u>**149**</u> | <u>**94**</u> | 72 |
| LAS | **11.1** | 40 | <u>**65**</u> | 28 | 21 | 26 |
| LAX | **7.3** | 19 | <u>**62**</u> | 13 | <u>**51**</u> | 24 |
| MCO | **11.1** | <u>**63**</u> | <u>**91**</u> | <u>**88**</u> | <u>**86**</u> | 25 |
| MDW | **29.3** | 58 | 26 | 64 | <u>**108**</u> | 19 |
| OAK | **5.8** | 0 | 17 | <u>**39**</u> | <u>**33**</u> | 11 |
| PHX | **21.5** | 22 | 38 | 60 | 59 | <u>**78**</u> |

4.    AMFA's and AMFA-Members' Communications About the Illegal Job Action

65.    Following the commencement of the write up campaign, AMFA published several statements to its members and the media that emphasized the importance of "safety" and "compliance"—key words that appeared to encourage AMFA's members to continue their write up campaign.  Tellingly, none of AMFA's communications discouraged its members from engaging in an illegal job action.   Even following Southwest's letter to AMFA on February 22, 2019, which (as discussed below) requested AMFA's assistance in ending the illegal job action, AMFA continued to publish statements where "safety" and "compliance" where the dominant themes, and instructions to cease the illegal job action were given only a secondary mention.

66.    AMFA and several of its members also posted to social media regarding the increased write ups and the news coverage surrounding Southwest's increased flight cancellations and delays.  Their messages frequently echoed the coded message of "safety" and "compliance."

67.    Courts have previously recognized that the use of similar language to be code for job actions.  *See United Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 563 F.3d 257, 272-72 (7th Cir. 2009) (recognizing union message of "fix it now" to be a coded phrase for a job action); *United Air Lines v. IAM*, 243 F.3d 349 (7th Cir. 2001) ("A union's suggestions to its mechanics to 'work safe' or to 'work by the book' are commonly recognized signals among union mechanics for a work slowdown" and "courts have found similar language to be 'codes' for job actions.").

68.    Examples of AMFA's and its members' comments include:

- On February 3, 2019, in response to an AMFA Facebook post about the contract negotiations, AMFA members encouraged an illegal job action:

  o   "How long are we as [a] group going to keep getting kicked down, Oh wait it's been 6.5 years so far."

  o   "[S]o start kicking back.  Follow the rules that they have laid down.  You can find all the rules in the MPM [Maintenance Procedural Manual] and MM [Maintenance Manual]."

  o   "Word for Word / By the Book and only By the Book this is your life protect it."

- On February 11, 2019—the day before Southwest began experiencing abnormally high write ups—a Midway AMFA-member was overheard saying, "We'll show the Company, the C-check line is going to be a shit show."

- On February 14, 2019, AMFA posted a video from Middlebrook's law firm to its social media. The video discussed the federal air safety whistleblower statute, AIR 21. AMFA's February 14, 2019 post appears to have been intended to encourage further unfounded and unwarranted write ups by wrongly suggesting that AMFA's unlawful coordinated activity would be protected by law. Meanwhile, AMFA took no action that day to abate the job action.

- On February 15, 2019, AMFA-members parroted AMFA's code language of "compliance" and "safety" for the illegal job action, stating: "This is merely compliance, compliance, compliance." And, "I'm seriously rooting for you guys right now…… compliance, compliance, compliance. And safety ALWAYS comes first."

- On February 16, 2019, an AMFA-member posted about the increase in write ups, and the intended effect of pressuring Southwest to increase its economic offer, stating: "[t]hey got themselves into this by pushing work. Now it's time to catch up. Time to make some money!"

- On February 19, 2019, Middlebrook tweeted" "Where is @gary_kelly? Not a word through all of this despite a self-proclaimed 'operational emergency' and no response to letters from multiple @SouthwestAir unions concerned over the safety of the operation. Lack of leadership starts at the top. #WheresGary @AMFANational." Again, AMFA urged its code of "safety," but did not urge the cessation of any concerted activity.

- On February 19, 2019, AMFA-members discussed the operational emergency declaration and the obvious illegal concerted activity. One AMFA-member noted:

"We can't say by the book, and normally you have 20 airplanes a day out of service, and suddenly you have 60 or more, and not consider it a job action.  A judge would eat your union alive, and say when things aren't going well, suddenly you notice[d] all these problems, when you didn't before.  We all know how the game is played."  In response, another AMFA-member stated "Unfortunately to get the Company to bargain fairly (Left up to the individuals [sic] interpretation) pressure sometimes needs to be applied to the business though."

- Following the social media postings, AMFA Assistant National Director, Gene Painter, tweeted a warning to AMFA's members: "To all AMFA members please be respectful of what you say about the current situation at Southwest Airlines. Remember the company is aware of what you say and could use it against you." Given Painter's tweet, it appears AMFA was aware of its members' discussion of an illegal job action, but elected to take no action to end it.

- On February 20, 2019, a Southwest mechanic discussed the recent state of emergency declaration and observed it was a clear illegal job action: "[W]hen you do the same task cards and you normally have 20 airplanes a day out of service, and then you go to 60 after negotiations not going well that is a job action.  We need to watch our backs.  Some idiot took a picture of the out of service screen and shared it with the media.  So now that feature is blocked in OTCS.  This is not a game."

- Coded messages of "compliance" and "safety" also permeated the AMFA Facebook page, from February 16-20, 2019.  Examples of AMFA-members' comments include:

  o "Compliance, hey if it is a smoking rivet, compliance"

    o   "Work today! Grieve tomorrow!!! Comply! Comply! Comply!"

    o   "Be Compliant…."

    o   "Compliance.  We LUV this Airline and want our aircraft to be completely

        safe.  Safety in the air begins with 100% compliance on the ground."

69.    By February 21, 2019, even the media recognized the illegal job action.  A Forbes

article[5] noted:

> Leaders of the Aircraft Mechanics Fraternal Association are shocked – shocked
> they say – that Southwest's executives blame any of their 2,700 mechanics for
> conducting some sort of informal job action against the company. That leaves only
> one improbable alternative: that the airline's maintenance delays shot up 2.5 times
> higher than normal (around 50 grounded planes vs. around 20 on most days) within
> just a couple of days of the frustrating end of the most recent, fruitless round of
> contract negotiations between AMFA and Southwest is the result of mere
> coincidence. Note: AMFA and Southwest have been locked in stalemated contract
> negotiations for six long years.

     5.    Southwest's Letter to AMFA and AMFA's Response

70.    On Friday, February 22, 2019—after experiencing two weeks of disrupted

operations—Southwest sent a letter to AMFA's ALRs for Locals 4, 11, 18, and 32—Burgess,

Hamlet, Lampley, and Bishop—with a copy to Middlebrook, Oestreich, and the AMFA Presidents

for Locals 4, 11, 18, and 32.   In the letter, Southwest notified AMFA of the strong statistical

evidence—including the aforementioned UAD data—establishing an unlawful behavior while the

parties remain engaged in collective bargaining negotiations and mandatory mediation under the

RLA—specifically, an inexplicable increase in maintenance write ups geared toward increasing

the number of out of service aircraft.  Southwest noted that the current concerted activity occurred

almost immediately after the last mediation session, and was exactly two years from AMFA's prior

---

[5] https://www.forbes.com/sites/danielreed/2019/02/21/all-grown-up-as-it-approaches-50-southwest-is-dealing-with-mature-airlines-kinds-of-problems/#32ff03fd7a7e

job action that is the subject of pending litigation.  Southwest asked that AMFA take prompt action to halt the concerted job action.

71.     AMFA responded to Southwest by telling Southwest it "should be ashamed" and calling Southwest's actions "deplorable."  Nevertheless, AMFA sent a letter to its members on February 22, 2019.  While the letter began by explaining the RLA's prohibition of self-help, the letter then noted that AMFA rejected Southwest's claim that its members were engaging in concerted action.  AMFA then proceeded to state in bold font: "**You, as a federally licensed Aircraft Maintenance Technician, have an obligation to ensure aircraft upon which you work only carry passengers in an airworthy condition.**"  The letter then encouraged AMFA members to report any "pressure" by Southwest to the FAA and to "work now, grieve later." AMFA also reminded its members that "[d]oing your job as a licensed Technician is not illegal." AMFA concluded by telling its members to "be safe and stay disciplined in unity."  In sum, AMFA's letter only half-heartedly discourages any illegal job action while strongly reminding its members of their ability to ground aircraft with maintenance write ups and reiterating its longer running message of coded encouragement.

72.     On February 24, 2019, AMFA ALR Bishop read—without emotion—the February 22, 2019 AMFA letter to Southwest's Phoenix station's AMFA-members.  When Bishop was asked if compliance was considered a slowdown, Bishop responded that it was not.  Instead of discouraging write ups aimed at removing aircraft from service, AMFA continued to implicitly encourage writes ups.

73.     AMFA's February 22, 2019 communication failed to comply with its legal obligations under the RLA.  As demonstrated below, the statistical evidence indicates that the

abnormal increase in write ups for minor issues is ongoing and continues to impact Southwest's operations.

| Station | Avg. UAD | UAD 2/23/19 | UAD 2/24/19 | UAD 2/25/19 | UAD 2/26/19 |
|---------|----------|-------------|-------------|-------------|-------------|
| BWI | **16.1** | 35 | 4 | 17 | 13 |
| DAL | **30.2** | 102 | <u>**105**</u> | 64 | 47 |
| HOU | **19.0** | 78 | 72 | <u>**81**</u> | <u>**90**</u> |
| LAS | **11.1** | 9 | 23 | <u>**57**</u> | 11 |
| LAX | **7.3** | 17 | 0 | <u>**46**</u> | <u>**44**</u> |
| MCO | **11.1** | 13 | 11 | 32 | 21 |
| MDW | **29.3** | 27 | 7 | 43 | 40 |
| OAK | **5.8** | 0 | 4 | 10 | 10 |
| PHX | **21.5** | 44 | 25 | 45 | 39 |

| Date | Number of aircraft out of service due to maintenance |
|------|------------------------------------------------------|
| Saturday, February 23, 2019 | 48 |
| Sunday, February 24, 2019 | 37 |
| Monday, February 25, 2019 | 49 |
| Tuesday, February 26, 2019 | 45 |
| Wednesday, February 27, 2019 | 51 |

74.    Upon information and belief, AMFA has not taken any steps to prevent its members from improperly writing up aircraft on a group basis besides its single, ineffective letter sent on

February 22, 2019 and subsequent station visits by AMFA's ALRs where the ALRs simply read the ineffective February 22, 2019 statement.  Upon information and belief, AMFA has not sent additional electronic communications or ensured that its Locals and agents have adequately communicated that its members must cease the unlawful job action.

75.     Upon information and belief, AMFA's agents, officers, and representatives, and members of AMFA's bargaining committee named as Individual Defendants, have explicitly and/or implicitly condoned and ratified the concerted increase in maintenance write ups.  AMFA and its agents, officers, and representatives also have undertaken only minimal, delayed, and ineffective efforts to stop the unlawful job action.

6.     Irreparable Harm Related to the February 2019 Job Action

76.     Defendants' actions are intended to, and likely will, cause irreparable injury to Southwest and to the public if they are not enjoined.

77.     As AMFA is well aware, the ongoing concerted effort to write up aircraft for minor issues in an attempt to remove the aircraft from service has resulted in the expanded use of third party vendors to provide additional maintenance in order to return Southwest's operation to normal conditions.  In addition, given the high number of aircraft out of service, Southwest lacks the facility space to perform all of the maintenance, and has had to ferry its out of service aircraft to third party vendors for repairs.  This has resulted in ongoing operational and financial impact to Southwest, which otherwise would not have been incurred absent the illegal job action.

78.     The concerted effort has and will continue to result in delayed or cancelled flights. Any delay or cancellation of flights has and will continue to inconvenience thousands of passengers and adversely affect the national transportation system.

79.     The concerted decision to use improper write ups to remove aircraft from service forces Southwest to cancel flights, and it will recover little of the revenue it would have earned from passengers on those flights.

80.     Southwest also incurs expenses related to delays and cancellations through increased labor expenses and costs related to providing customers with alternative travel, food, luggage delivery and hotel expenses.  Southwest also suffers harm to its reputation and goodwill as a result of such delays, cancellations, and inconvenience to its customers.

81.     Southwest's experience has shown that passengers whose flights are cancelled may not postpone their travel on Southwest but may make alternative arrangements on other airlines. Southwest not only loses the revenue from the flight at issue, but for outbound passengers, it may well lose the revenue that would be gained from the return flight as well.  In addition, passengers are more likely to turn away from Southwest for their future travel plans.

82.     The irreparable harm from AMFA's job action also impacts other parts of the national transportation system.  Southwest's operations are a vital part of the national and international passenger and freight transportation system that may experience disruption should the unlawful job action not cease immediately.  Such disruption would deprive the public of efficient and timely transportation services.

83.     Thus, while Southwest need not make a showing of irreparable harm to secure even preliminary injunctive relief under the asserted sections of the RLA, the damages and loss of goodwill that Southwest may suffer if AMFA's unlawful job action is not enjoined nonetheless are unquantifiable, immediate, and irreparable.

84.     As to each item of relief sought, greater injury will be inflicted on the public and upon Southwest if such relief is denied than will be inflicted upon the Defendants by the granting of the relief sought.

## IV.   CAUSES OF ACTION

### COUNT I
### Violation of Railway Labor Act Section 2, First
### 45 U.S.C. § 152 First
### Failure to Exert Every Reasonable Effort to Make and Maintain Agreements[6]

85.     Southwest re-alleges and incorporates by reference the allegations contained in the preceding paragraphs numbered 1 - 84 as if they were fully set forth in this paragraph.

86.     As a party to an agreement governed by the RLA, AMFA—and its National and Local leadership, including the Individual Defendants—have a duty to exert every reasonable effort to make maintain agreements concerning rates of pay, rules, and working conditions.  45 U.S.C. § 152 First.

87.     Inherent in the duties imposed by RLA Section 2, First is a duty to negotiate in good faith with a desire to reach agreement.

88.     The duty to "exert every reasonable effort to make and maintain agreements" is "more than a mere statement of policy or exhortation to the parties; rather, it was designed to be a legal obligation, enforceable by whatever appropriate means might be developed on a case-by-case basis."  *Chicago & N.W. Ry. Co. v. United Transp. Union*, 402 U.S. 570, 577 (1971).  Indeed, "the obligation under [Section 2, First] is central to the effective working of the Railway Labor Act."  *Id.* at 578.

---

[6] Southwest previously filed a motion for leave to file an amended complaint asserting a 45 U.S.C. § 152 First claim related to the failed TA in the February 2017 Job Action Litigation.  However, in light of the new job action, Southwest withdraws its motion for leave, and pursues claims for both the failed TA and the 2019 job action in this Complaint.

89.     In determining whether a party has violated its duty under RLA Section 2, First to negotiate in good faith, a court should consider whether the party's conduct demonstrates a desire to avoid, rather than make, a new agreement.

90.     Far from exerting every reasonable effort to make and maintain the TA between Southwest and its mechanics and related employees, AMFA and the Individual Defendants then-in office took affirmative steps to undermine the parties' AIP in April 2018 and codified as a TA in June 2018 when they deployed an orchestrated campaign to undermine the agreement.

91.     By entering into a TA with Southwest and then engaging in a deliberate, sustained effort to ensure the failure of that same agreement, AMFA and the Individual Defendants violated their duty to "exert every reasonable effort to make and maintain agreements" under Section 2, First.

92.     Southwest is entitled to declaratory relief and injunctive relief for Defendants' violation of Section 2, First of the RLA, 45 U.S.C. § 152 First.

## COUNT II
### Violation of Railway Labor Act Section 6
### 45 U.S.C. § 156

93.     Southwest re-alleges and incorporates by reference the allegations contained in the preceding paragraphs numbered 1 - 92 as if they were fully set forth in this paragraph.

94.     The Defendants are attempting to change the rates of pay, rules and working conditions provided for in the collective bargaining agreement between Southwest and AMFA by engaging in unprotected concerted activity without first exhausting the RLA's major dispute resolution procedures.

95.     The concerted increase in mechanic write ups orchestrated, condoned, and/or ratified by the Defendants, and those mechanics and related employees acting in concert with

Defendants, constitutes a breach of AMFA's *status quo* obligation under Section 6 of the RLA, 45

U.S.C. § 156, which prohibits the use of economic self-help prior to the expiration of the statutory

negotiation and mediation procedures specified in Sections 5 and 6 of the RLA.  45 U.S.C. §§ 155,

156.

96.     Southwest is entitled to declaratory relief, injunctive relief, and damages for

Defendants' unlawful concerted self-help activity that violates Section 6 of the RLA, 45 U.S.C.

§ 156.

**COUNT III**
**Violation of Railway Labor Act Section 2, First**
**45 U.S.C. § 152 First**
**Encouragement/Ratification of the Unlawful Job Action**

97.     Southwest re-alleges and incorporates by reference the allegations contained in the

preceding paragraphs numbered 1 - 96 as if they were fully set forth in this paragraph.

98.     The actions of Defendants' agents, officers, and representatives, including the

Individual Defendants, to orchestrate, condone and/or ratify, implicitly or explicitly, the unlawful

self-help activity of AMFA-represented employees constitutes a breach of AMFA's obligations

under Section 2, First of the RLA, 45 U.S.C. § 152 First, to "exert every reasonable effort to make

and maintain agreements concerning rates of pay, rules, and working conditions and to settle all

disputes," so as to avoid any interruption to commerce or to Southwest's operations.

99.     An injunction is the only practical and effective means to compel compliance with

the Defendants' statutory duty under Section 2, First of the RLA, 45 U.S.C. § 152 First in Count

II.

100.    Southwest is entitled to declaratory relief and injunctive relief for Defendants'

violation of Section 2, First of the RLA, 45 U.S.C. § 152 First.

## COUNT IV
### Violation of Railway Labor Act Section 2, First
### 45 U.S.C. § 152 First
### Failure to Take Every Reasonable Effort to Stop the Unlawful Job Action

101.     Southwest re-alleges and incorporates by reference the allegations contained in the preceding paragraphs numbered 1 - 100 as if they were fully set forth in this paragraph.

102.     AMFA's February 22, 2019 notice and subsequent station visits have been ineffective as the concerted increase in maintenance write ups has continued, and Southwest has received no information from AMFA or its agents on other genuine efforts, through electronic or in-person communications, to cease the job action.

103.     Defendants have an obligation to take every reasonable effort to prevent and end AMFA-represented employees from engaging in unlawful self-help activity.  Defendants have not exhausted all reasonable efforts and in fact have undermined those efforts.

104.     The Defendants' failure to take all reasonable steps to prevent AMFA-represented employees from engaging in unlawful self-help activity constitutes a breach of their obligations under Section 2, First of the RLA, 45 U.S.C. § 152 First, to "exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions and to settle all disputes," so as to avoid any interruption to commerce or to Southwest's operations.

105.     An injunction directing the Defendants to take all reasonable steps to prevent and/or end unlawful self-help activity is the only practical and effective means to compel compliance with the Defendants' statutory duty under Section 2, First of the RLA, 45 U.S.C. § 152 First.

106.     Southwest is entitled to declaratory relief and injunctive relief for Defendants' violation of Section 2, First of the RLA, 45 U.S.C. § 152 First.

## V.   RELIEF REQUESTED WITH RESPECT TO UNLAWFUL CONDUCT DURING THE NEGOTIATION AND RATIFICATION PROCESS

WHEREFORE, Southwest further prays that this Court:

1.    Issue a declaratory judgment holding that the Defendants' conduct during the negotiation and ratification process, as described herein, constitutes a failure to exert every reasonable effort to make and maintain an agreement concerning rates of pay, rules, and working conditions, in violation of Section 2, First of the RLA, 45 U.S.C. § 152 First.

2.    Issue an order requiring the Defendants to exert every reasonable effort to make and maintain any tentative agreement reached between Southwest and AMFA.

3.    Southwest further prays for such other and further relief, including but not limited to attorneys' fees and costs, as the Court may deem proper.

## VI.   RELIEF REQUESTED WITH RESPECT TO THE UNLAWFUL JOB ACTION

WHEREFORE, Southwest prays that this Court:

1.    Issue a declaratory judgment holding that the Defendants' conduct with respect to the unlawful job action described herein constitutes unlawful, premature self-help and/or failure to take reasonable steps to end the unlawful self-help in violation of Section 6 and Section 2, First of the RLA, 45 U.S.C. §§ 156 & 152 First;

2.    Issue a permanent injunction restraining and enjoining AMFA and the Individual Defendants, in their personal capacities as well as their capacities as officers of AMFA, and their agents, successors, deputies, servants, and employees, and all persons acting by, in concert with, through or under Defendants or by and through their orders:

a.    From calling, permitting, instigating, authorizing, encouraging, participating in, approving of, or continuing any delay, any disruption, curtailment or restriction of Southwest's normal airline operations, including but not limited to strikes,

concerted write ups, and/or other forms of self-help, or otherwise interfering with the operations of Southwest.

b.     Ordering that the said Defendants and said other persons acting in concert with them shall immediately take all reasonable steps within their power to prevent the aforesaid actions from continuing, and to refrain from continuing the aforesaid actions.

c.     Ordering that the said Defendants shall immediately instruct all AMFA-represented mechanics and related employees employed by Southwest to cease all premature job actions.

d.     Ordering that the said Defendants notify, by the most expeditious means possible, all AMFA-represented mechanics and related employees employed by Southwest of the issuance, contents and meaning of this Injunction Order and provide Southwest with a copy of all such notices.

e.     Ordering that the notices described in paragraphs (c) and (d) above include a directive from AMFA to all AMFA-represented mechanics and related employees employed by Southwest who are engaging in the aforesaid actions to immediately cease and desist all such activity and to immediately cease and desist all exhortations or communications encouraging same.

f.     Ordering that the Defendants post this Court's Order on all AMFA bulletin boards at Southwest's facilities and publish in all AMFA publications and include and/or transmit the contents of this Court's Order in all recorded telephone hotlines, websites or other methods of electronic communications under control of

Defendants, or any of them, and provide a transcription of all such messages to Southwest.

g.     Ordering that the Defendants report to the Court, by sworn affidavit, the methods used to effect the notices described in the paragraphs above to all AMFA-represented mechanics and related employees employed by Southwest; and

3.     Award damages for the costs that Southwest has incurred in responding to the Defendants' illegal job action and violation of Section 6, including but not limited to the costs of obtaining necessary third party vendor coverage due to the coordinated increase in write ups to remove aircraft from service and any subsequent illegal job actions or coordinated efforts to disrupt Southwest's operations.

Dated:  February 28, 2019                    Respectfully submitted,

                                              /s/ *Paulo B. McKeeby*

                                             Paulo B. McKeeby, Bar No. 00784571
                                             Michael A. Correll, Bar No. 24069537
                                             Amanda E. Brown, Bar No. 24087839
                                             Morgan, Lewis & Bockius LLP
                                             1717 Main Street, Suite 3200
                                             Dallas, TX 75201
                                             paulo.mckeeby@morganlewis.com
                                             michael.correll@morganlewis.com
                                             amanda.brown@morganlewis.com
                                             Tel: (214) 466-4000
                                             Fax: (214) 466-4001

                                             Jonathan A. Fritts (*pro hac vice forthcoming*)
                                             David Broderdorf (*pro hac vice forthcoming*)
                                             Morgan, Lewis & Bockius LLP
                                             1111 Pennsylvania Ave. N.W.
                                             Washington, D.C.  20004
                                             jonathan.fritts@morganlewis.com
                                             david.broderdorf@morganlewis.com
                                             Tel: (202) 739-3000
                                             Fax: (202) 739-3001

                                             *Counsel for Plaintiff Southwest Airlines Co.*